UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES D. LYONS, | ) | Case No.  4:03 CV 0244 |
| | ) | |
| Petitioner, | ) | Judge Peter C. Economus |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| UNITED STATES OF AMERICA, | ) | (Regarding ECF #76) |
| | ) | |
| Respondent, | ) | Magistrate Judge James S. Gallas |
| | ) | |

Plaintiff James D. Lyons is a federal prisoner who by way of his *pro se* "amended and supplemental complaint" (Docket No. 32) seeks $1.5 million in compensatory damages under the Federal Tort Claims Act) (FTCA [28 U.S.C. §1346(b), §2671-2680], on three general grounds: (1) negligence in providing a safe and secure environment at FCI-Elkton that contributed to a February 12, 2000 assault that resulted in head injury, and related to this negligence in classifying and separation of violent inmates; (2) negligence in treatment of injuries resulting from an inmate assault; and, (3) obstruction of justice by their failure to adequately investigate the assault which prevented Lyons from filing any charges against his attackers.  The United States has moved for summary judgment.


Under Rule 56 of the Federal Rules of Civil Procedure granting a motion for summary judgment is only proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  In determining whether there is a genuine issue of material fact all inferences drawn from the underlying facts contained in affidavits, pleadings, responses to discovery requests, and depositions must be viewed in the light most favorable to the party opposing

4:03 CV 0244                                          2

the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).  A court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The court may not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment.  *Anderson*, 477 U.S. at 255.  The burden is upon the movant to demonstrate the absence of a genuine issue of material fact.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979), *cert. dismissed* 444 U.S. 986 (1979).  However, the nonmoving party is obliged to produce some evidence other than mere pleadings themselves to demonstrate that there is a genuine issue for trial. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The nonmoving party must produce significant probative evidence in support of the complaint to defeat the motion for summary judgment through affidavits or admissions on file.  *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339-40 (6th Cir. 1993).  In the final analysis, "the threshold inquiry . . . [is] whether there is a need for trial -- whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250; *Moore*, 8 F.3d at 340.  Once the nonmoving party has responded , the court must view the facts in the light most favorable to the nonmoving party. *Darrah v. City of Oak Park,* 255 F.3d 301, 304 n.1 (6th Cir. 2001).

4:03 CV 0244                                  3

*Failure to Protect and Classify:*

Lyons' first set of allegations claims negligent acts or omissions by prison authorities at FCI-Elkton and failure to provide a safe and secure environment that contributed to the February 12, 2000 assault which resulted in significant head injury (Lyons Opposition p. 2, ECF #83). Lyons suffers urological problems and wears a catheter which he claims made him especially vulnerable to attack (Amended Complaint ¶¶6-7, 13-16, 71, Aff. ¶¶6, 11, 13, 16). He states that FCI-Elkton was designed and built as a low security correctional facility with cubicles for three men in an open dormitory style with five foot concrete wall partitions between cubicles (Amended Complaint ¶¶8-10). Lyons was housed in Unit CB which contained approximately 200 inmates which was connected to Unit CA where only one officer ordinarily manned the unit at a ratio of one to 400 inmates. (*Id.*). Lyons states that before the attack neither the regular unit officer nor the unit counselor were at their assigned posts (Affidavit, ¶¶41-42, ECF #83-2). He further claims that the inmate population included a large percentage of INS detainees who are ethnically hispanic and openly hostile and violent toward Afro-Americans and caucasians. *Id.* At the time of the incident Lyons was classified as a minimum security inmate and was sleeping in his cubicle as a result of a urinary tract infection when he was attacked by a large number of Mexican gang members. *Id.* Lyons states in both his amended complaint and his affidavit that he had been asleep at the time (Amended Complaint, ¶13, Aff., ¶40, ECF #83-2). However, he explains that the Hispanics gathered at the latrine where they became intoxicated before beginning their rampage (Aff. ¶41).[1] Lyons claims that he was severely beaten and his head rammed repeatedly into a concrete partition

_____

[1] Fed. R. Civ. P. 56(e) requires that the affidavits be made on personal knowledge and Lyons could not both be asleep and scouting the CB unit where he was housed. Judicial review is constrained only to the fact that Lyons was asleep at the time.

4:03 CV 0244                                    4

wall and metal bedpost (Aff. ¶44).  Lyons claims the government was negligent in failing to safeguard and protect him while in custody at FCI-Elkton.

Under the FTCA "the United States has consented, subject to certain exceptions, to suit for damages for personal injuries caused by the negligence of government employees acting within the course and scope of their employment."  *Montez v. U.S.*, 359 F.3d 392, 395 (6ᵗʰ Cir. 2004); and see 28 U.S.C. §1346(b).  A "significant limitation" on this federal governmental waiver of sovereign immunity is the "discretionary function exception" contained in 28 U.S.C. §2680(a)**.** [2]  See *Montez* at 595.

The government addresses the allegations in this first count as an Eighth Amendment claim, not as a FTCA matter.  None of the government's arguments relates to Lyons' allegations, which leads to the question of  whether the court can dismiss this and other claims on its own motion for lack of subject matter jurisdiction. The Sixth Circuit had adopted a rule in *Carlyle v. U.S. Department of the Army*, that "a plaintiff can invoke jurisdiction only if the complaint is facially outside the exceptions of §2680 . . .  [o]nly after a plaintiff has successfully invoked jurisdiction by pleading that facially alleges matters not excepted by §2680 does the burden fall on the government

---

[2] The provisions of this chapter and section 1346(b) of this title shall not apply to --

> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C.A. §2680 (West 2006).

to prove the applicability of a specific provision of §2680."  *Id.*, 674 F.2d 554, 556 (6th Cir. 1982) (citations omitted); and see *Sharp ex. rel. Estate of Sharp v. U.S.*, 401 F.3d 440, 443 n. 1 (6th Cir. 2005).  *Carlyle* is one of several cases which conclude that the district court lacks jurisdiction over a matter under the discretionary function exception.   *Carlyle*, 674 F.2d at 556; *Feyers v. U.S.*, 749 F.2d 1222, 1225 (6th Cir. 1984); *Rich v. U.S.*, 119 F.3d 447, 450 (6th Cir. 1997), *cert. denied*, 523 U.S. 1047 (1998); *Sharp, ex rel. Estate of Sharp v. U.S.*, 401 F.3d 440, 443 (6th Cir. 2005)  *Sharp, ex rel. Estate of Sharp v. U.S.*, 401 F.3d 440, 443 (6th Cir. 2005).  ("If the discretionary function exception applies and Congress has not otherwise waived the United States' immunity, then we lack subject matter jurisdiction over the action.").  *Carlyle*'s reasoning was questioned in *Sharp* but left undisturbed.  *Sharp*, 401 F.3d at 443 n. 1.


        In *Carlyle,* the government did not raise the discretionary function exception in any pretrial pleadings but awoke during trial, when it moved to dismiss.  *Id.*, 674 F.2d at 556.  Here, the government also does not assert discretionary function, but the language of *Carlyle* appears to allow the Court to raise the matter *sua sponte,* as the court can recognize whether it has jurisdiction over a matter at all times.  *E.g. Chicot Cty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376 (1940); *U.S. v. Ruiz*, 536 U.S. 622, 628 (2002).  Consequently, Lyons must successfully invoke the court's subject matter jurisdiction by pleading matters that facially are not excepted by §2680.  On review Lyons has not borne his burden of persuading the court that it has subject matter jurisdiction over the allegations under the first and third counts, and  a portion of the second count.

4:03 CV 0244                                    6

In his amended complaint and affidavit Lyons refers to 18 U.S.C. §4042(a) as evidencing a nondiscretionary duty to provide for his safekeeping and protection (Affidavit, ¶65) and he refers the court to *Bultema v. U.S.*, 359 F.3d 379 (6th Cir. 2004). Lyons' briefing shows that he is aware that the U.S. Supreme Court has developed a two-prong test to govern the application of the discretionary function exception. See *U.S. v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Berkovitz v. U.S.*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). First, there is the discretionary matter prong, where the conduct must involve "an element of judgment or choice." *Id.*   Then there is the policy prong where the court must determine, "whether that judgment is the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23; *Berkovitz*, 486 U.S. at 536.  "[T]he purpose of the exception is to 'prevent judicial second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Gaubert* at 323; *U.S. v. Varig Airlines*, 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

Lyons' reliance on *Bultema* is misplaced.  He relies on conduct involving bottom bunk passes issued by medical staff at FCI-Elkton.  This action was found to be  neither a matter of discretion nor a matter of "across-the-board policy" to fall under the discretionary function exception. *Id.*, 359 F.3d at 384-85.  Had Lyons turned a few more pages he would have found that his argument is futile in light of *Montez* where the court reasoned

> But the duty imposed by §4042(a) is of a general nature, broadly requiring that the BOP 'provide for the safekeeping' and 'provide for the protection' of federal inmates.  *BOP officials are given no guidance, and thus have discretion, in deciding how to accomplish these objectives.* (emphasis added).

359 F.3d at 396.

*Montez* held that §4042(a) is not governing the conduct – thus there is discretion.  However, "if the decision involved discretion but the exercise of that discretion was not based on public policy considerations, the claim is outside the exception and can continue."  *Cottage v. U.S.*, 2007 WL 1101245 at *3 (N.D. Ohio); *Gaubert*, 499 U.S. at 324.  *Montez* provides no firm rule on the second prong, but only a governing principle  that, "decisions by prison officials to ignore specific and immediate threats against inmates are less likely to be the type of decision that can be said to be grounded in the underlying policy of the BOP, which requires prison officials to provide for the safekeeping and protection of inmates."  *Montez*, 359 F.3d at 398.  Thus, the key is a specific and immediate threat against Lyons.

Likewise, Lyons also alleges that prison authorities were negligent in failing to classify the "INS illegals," and separate the known particularly violent ones (Amended Complaint, ¶71).  Lyons claims that there was a "constant threat" of violence from hispanic groups and he criticizes the prison's layout claiming that the open dormitory style had low walls that were vulnerable to concealment without direct visual contact by officers.  *Id.*  However federal prison authorities, in general, have broad discretion in classifying prisoners in terms of their custodial status.  *See Jones v. U.S.*, 534 F.3d 53, 54 (5th Cir. 1976), citing Annot. 41 A.L.R.3d 1021 (1972).  Also as explained in *Montez*, federal prison authorities have discretion in whether to remove a prisoner from the general population for safety reasons, or for protection (*Id.*, 359 F.3d at 396-97), and there is discretion in deciding when disciplinary action is necessary (*Id.*; see also *Calderon v. U.S.*, 123 F.3d 947, 949 (7th Cir. 1997).  As an illustration, in *Jones v. U.S.*, several factors were listed as indicators

4:03 CV 0244                                      8

of conduct contrary to public policy such as: federal prison authorities' knowledge or awareness of problems existing between the plaintiff and other prisoners, whether the plaintiff had requested protection or segregation from the general inmate population, some extraordinary incident prior to assault, or group tension observed by the correctional staff.  See *Jones v. U.S.*, 434 F.3d at 54. [3]

Lyons' affidavit fails to show that prison authorities knew of specific and immediate threats from others.  Lyons refers in his affidavit to his amended complaint (Affidavit, ¶40, Amended Complaint, ¶¶13-16).  Again, however, these allegations assert no specific and immediate threat.  Lyons states that he was told that "they" knew about hispanic gangs (Aff. ¶49), and prior to February 2000, hispanic gang activity was "well known" and, "I knew full well to avoid any and all confrontations with such individuals . . . due to violent gang attacks" (Aff. ¶50).  Again due to the personal knowledge requirement of Fed. R. Civ. P. 59(e) Lyons may only address his own fears, and he cannot speak for his custodians.  Also he fails to mention particular incidents which would tend at least to show there was a specific and immediate threat from the hispanic gangs.

Finally Lyons' allegations are weakened by his statement that there was no prison security present at the time.  This removed his situation from comparison with of *U.S. v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), where a prisoner was  beaten by an inmate while guards idly stood by.  In *Montez* the court reasoned that, "[a]lthough the *Muniz* Court did not decide whether the discretionary function exception applied, a complaint alleging the facts set forth in

_____

[3] Although *Jones* was decided before the Supreme Court set forth the two-pronged test for discretionary conduct in *Berkovitz*, its reasoning easily fits within current analytical procedure.

4:03 CV 0244                              9

*Muniz* would be adequate, in our opinion, to survive a motion to dismiss because of a guard's conscious decision not to protect an inmate from a specific and immediate threat cannot 'be said to be grounded in the policy of the regulatory scheme.'" *Montez*, 359 F.3d at 398. Lyons has not removed his allegations for discretionary action by government authorities in those cases over which the court lacks jurisdiction under the FTCA. See *Rich v. U.S.*, 119 F.3d at 450.

Lyons appears to include a claim that prison architecture bore some responsibility for his injury. However case law has held in favor of the government against allegations that it was negligent in design or construction of its facilities. *E.g. Fortney v. U.S.*, 912 F.2d 722 (4th Cir. 1990) (Army ammunition plant); *Moreno v. U.S.*, 965 F.Supp. 521 (S.D. N.Y.) (apartment building seized by U.S. Marshal); *Chantal v. U.S.*, 104 F.3d 207 (8th Cir. 1997) (Jefferson National Expansion Memorial); *Schuyler v. U.S.*, 987 F.Supp. 835 (S.D. Col. 1997) (3-story pedestrian ramp at U.S. border). Again there is a presumption that discretionary acts are grounded in policy [4] and safety must be balanced against financial resources. See *Chantal*, 104 F.3d at 212; *Bowman v. U.S.*, 820 F.2d 1393 (4th Cir. 1987). Accordingly, Lyons's first claim only involves conduct excluded from coverage under the FTCA by the discretionary function exception, and the court in recognition of its own jurisdictional limitations must dismiss.

*Medical Malpractice:*

Lyons' next claim is that prison authorities had a mandatory duty to provide medical care under 18 U.S.C. §4042(a) and BOP Program Statement 6000.05 and they failed in that duty by

_____

[4] *Gaubert*, 499 U.S. at 324, 111 S.Ct. at 1274-75.

4:03 CV 0244                                    10

unreasonably delaying in providing medical treatment, failing to provide proper diagnostic equipment to evaluate his head injury and medical malpractice (Amended Complaint ¶66, 76-79). In his affidavit Lyons complains that he continues to suffer from headaches, memory and attention impairment, ringing in his ears, dizziness, insomnia and intermittent depression due to the February 12, 2000 head trauma and all available medical reports show that he has no sign or evidence of any neurological disease while there is evidence of head trauma (Affidavit ¶¶93-94, ECF #83-2).  He also states he has never received any neurological related rehabilitative treatment from the BOP after his head injury and he still requires vocational rehabilitation and pain treatment (Affidavit ¶95).  In his affidavit Lyons states that he was rendered unconscious by the February 12, 2000 assault and later examined by a nurse who found no problems (Affidavit ¶¶44-45).  Lyons was subsequently seen by prison medical staff six more times at FCI-Elkton, given Tylenol and allegedly told to stop complaining (Affidavit ¶¶46-47, 52).

Lyons complains that lower level medical staff interceded in his scheduled June 13, 2000 appointment with a physician and was told that there was nothing wrong with him (Affidavit ¶54). This staff member allegedly told Lyons that an MRI or CT scan had been conducted of the head injury, which was not correct, yelled at Lyons, and ordered him out of the office without examination (¶54).  The staff member prepared a psychological referral which was countersigned by a nonexamining physician (*Id.*).  Lyons explains that on February 16, 1999 he had both an MRI and a CT scan with contrast performed at Columbus Community Hospital which showed minor abnormalities and indications consistent with sinusitis.  He explains that these head scans provided a relevant base line for his subsequent medical care (¶24).  He further explains that prior to

4:03 CV 0244                                11

incarceration he experienced a number of previous mild head injuries dating back 25 years that resulted in concussions without any permanent or residual effects (¶18).  He also states that prior to this he did experience sinus related headaches, which he refers to as "HAs."  (¶19).

Lyons visited a psychologist on June 20, 2000 who found Lyons' problems to be caused by anxiety since the CT scan was normal (¶55).  Lyons informed the psychologist that there was no post-injury CT scan.  *Id.*  Lyons pointed out his neurological and memory problems but the psychologist stated that the problems were resolved over time (¶55).  Lyons maintains that the psychologist is not credible because the psychologist claims that it was impossible for Lyons to be harmed by having his head rammed against a concrete wall.  *Id.*  Lyons declined all further psychological treatment.  *Id.*  But his self-diagnosed claims were that he had been suffering from depression and insomnia (¶56).

The first post-trauma CT scan was ordered by a different staff physician for August 22, 2000 (¶57).  Lyons admits that the findings were normal.  *Id.*  In the followup by the original staff physician, Lyons was allegedly told that he wished he had known sooner about Lyons head injury and that a complete MRI could have been performed since it would show different details than the CT scan ¶58).  Lyons points out this physician also is not credible because his signature appears on the February 2000 injury report with that of the nurse and on the psychological referral which apparently notes Lyons' head injury.  (*Id.*).

4:03 CV 0244                                        12

In any event, on August 31, 2000 the physician prescribed anti-seizure medication for Lyons' complaints of "staring spells" (¶59).  Lyons admits that with the medication his staring spell incidents decreased in frequency and duration and were nearly resolved by the beginning of 2003 (*Id.*), but he continued to have memory lapse and attention difficulty (¶60).

A second post-trauma CT scan was conducted on October 4, 2000 (¶62).  It revealed no abnormalities and an EEG was also negative (¶62).  At the November 22, 2000 followup Lyons complained of dizziness, ringing in his ears and staring spells.  The physician continued the anti-seizure medication (¶63).  Lyons states that the physician had diagnosed "mild head injury with probable concussion 2/12/2000" (¶64).

Lyons complains that this physician's medical treatment referral prepared commensurate with Lyons' transfer to Federal Medical Center (FMC)-Lexington contained several errors including that a post-trauma MRI study had been conducted, when it had not (¶64).

Lyons was transferred from FCI-Elkton to FMC-Lexington on January 30, 2001 (¶64), and was examined by a neurologist on March 14, 2001 (¶65).  An MRI was ordered which revealed scattered foci of abnormal signal in deep white matter bilaterally likely related to minimal small vessel ischemia/gliosis (¶66).  Lyons complains that there was no neurological followup (*Id.*).

Lyons was again seen by a different psychologist beginning in May 2001 (¶ 67).  Lyons was not satisfied due to the limited scope of the examination and the psychologist's claim that no harm

could be suffered from Lyons' head hitting a concrete wall and the psychologist's claim that neuropsychological examination was unnecessary (¶ 67).  As Lyons points out he did eventually receive the neurological psychological evaluation, but that was not until June 18, 2004 (¶87).

Although there was no neurological followup, Lyons' medication was changed to "Neurontin" in June 2001 (¶68).  Lyons only complains that he could not "correlate" improvement due to the change in medication because his staring spells had prior to this time been decreasing in frequency and intensity (¶68).

Lyons also complains that he was not provided with physical rehabilitation for his loss of balance and coordination and consequently was required to devise his own rehabilitation regimen (¶70).  His homespun rehabilitation regimen proved somewhat successful because Lyons states that his self-evaluation found improvement in coordination with some remaining balance problems. (*Id.*).

Lyons was transferred to FMC-Butner where he saw another neurologist on September 10, 2001 (¶¶69, 71).  This neurologist allegedly recommended EEG, neuropsychological testing and continuation of current medication.   (*Id.*).  The EEG study was normal but again the neuropsychological testing was not conducted until June 2004 (¶¶71, 87).

At FMC-Butner during November 2001 Lyons agreed to psychological therapy (¶72).  After several sessions Lyons was returned to "favorable" psychological status (*Id.*).  (Although not mentioned in Lyons' affidavit, in his amended complaint, he claimed that on April 2, 2000 his

4:03 CV 0244                                      14

psychological status had been downgraded from favorable to unfavorable (Amended Complaint, ¶44, ECF #32)).

During February 2002 Lyons was first seen by a third neurologist (Affidavit ¶73).  This physician allegedly told Lyons that he could not have been harmed from having his head against a concrete wall and that he was only interested in ruling out disease and related significant neurological malfunction and was not interested in minor neurological deficits (*Id*.)  Two sets of EEG and visual evoked potential tests were ordered (¶¶73-76).  All sets of tests, which were conducted between March 2002 and August 2002 revealed normal findings (*Id*).  In the followup the third neurologist found no concern over epileptic seizures and that the attention difficulties were irrelevant since Lyons was incarcerated (¶77).  The doctor ordered a followup MRI to rule out any progressive neurological disease (*Id.*).

Lyons at this point admits that his staring spells had decreased and that there was improvement in his neurological deficits (¶77).

A second post-trauma MRI was conducted on November 25, 2002 which revealed nonspecific findings of mild generalized cerebral atrophy, six spots of "white matter" and no signs of demyelinating disease (¶78).

Lyons claims that from that time to March 2003 he did not receive any examinations but in March 2003 his prescription to Neurontin was discontinued because it was removed from the prison

4:03 CV 0244                                    15

"formulary."  His prescription was changed to Amitriptyline, which Lyons claims was totally
ineffective and had negative side effects (¶79).

While in transit to FCI-Elkton on July 2, 2003 he did not receive neurological medication
and only intermittently received Tylenol for pain (¶80).

At FCI-Elkton  on August 27, 2003 another post-trauma MRI was ordered.  The staff
physician's report stated that the MRI findings could also have been seen in a patient with previous
head injury (¶81).  Lyons complains that the staff physician's report did not match prior MRI reports
and that the staff physician could not have reviewed the prior MRI reports (*Id.*).

On November 17, 2003 Lyons saw the third neurologist after his transfer to FMC-Butner for
a third time who stated that the MRI reports were overall "non-specific and showed no progression
of lesions or neurological disease." (¶¶82-84).  This physician allegedly told Lyons that his attention
deficit was irrelevant and did not need to be addressed while incarcerated and refused to discuss the
recommendation for a neuropsychological evaluation.  Also this physician stated that no further
neurological treatment was required and medication was to be discontinued, which it was by the end
of 2003.  (¶¶83-84).

In Lyons' fourth visit to this third neurologist, Lyons claims that the doctor restated that
Lyons could not have been harmed by his head hitting against the concrete wall and he should stop

4:03 CV 0244                                    16

complaining and get over it (¶85).  The physician further said that no further neurological treatment was needed and that any problems he had had to be psychological in nature.  (*Id.*).

Lyons at this point states he disagreed with the physician's conclusion and requested to have a full explanation of the MRI results which the physician refused and refused to order a neuropsychological exam (¶85).

Although Lyons claims that the doctor refused to discuss the neuropsychological exam, Lyons admits finally that on June 18, 2004 he had a neuropsychological evaluation (¶86).  The neurological evaluation stated there were attention and memory problems, limited processing capabilities "consistent with acquired neurological problems while incarcerated can function due to limited environment" (*Id.*).  The examiner noted overall condition was "mild acquired neurological problems" in which there were "attention problems in academic or work settings requiring sustained attention."

Lyons states that this report clearly documents cognizable limitations which are significant considering that his prior occupation was as a chemist and that he is no longer capable of performing this past work (¶87).

In late 2004, Lyons was prescribed an antidepressant which he was told would have beneficial effect on cognitive abilities (¶88).  In a followup by the neuropsychological evaluator for the effects if any from the antidepressant showed that medication seemed to have a beneficial effect

4:03 CV 0244                                          17

on cognitive deficits that was quantifiable.  Lyons claims that this report shows that treatment "options" and rehabilitation was possible (¶ 90).

Lyons complains finally that in July 2006 the antidepressant medication was discontinued because it also was removed from the "formulary."  (¶91).  Since that time he has been taking only Tylenol for headaches which has had only slight effect on the pain levels and further, since it is an over-the-counter medication, he is required to purchase Tylenol from the prison commissary which he can rarely afford (¶92).

The government contends that Lyons cannot maintain a claim of medical malpractice first because the available medical evidence indicates that he did not sustain a recognizable injury.   In support of this assertion, the government relies on the aforementioned affidavit of Mr. Howard, the attorney advisor at the Federal Detention Center for the United States Department of Justice. Attorney Howard concludes, "Despite being seen repeatedly by numerous Bureau of Prisons and outside medical staff over the course of his incarceration, Mr. Lyons' medical records failed to substantiate any injuries he claims to have suffered in the complaint."  (Howard Affidavit, ¶5, ECF #76-3).

Mr. Howard's conclusion cannot be accepted by the court.  FRE 803(6) and its companion 902(11) except "records of regularly conducted activity" from the hearsay prohibition.  FRE 803(6) permits, "A memorandum, report, record, or data compilation in any form, of acts, events, conditions, *opinions, or diagnoses* made at or near the time, by or from information transmitted by,

4:03 CV 0244                                    18

person with knowledge, if kept in the course of the regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation . . ." (emphasis supplied).  There is no question then that the diagnoses and opinions from these physicians can be submitted in this fashion.  However the exception is limited to those records themselves, and does not extend to Mr. Howard's comment or opinion on his perception of those records.  Further Mr. Howard's comment is not based on personal knowledge as required by Fed. R. Civ. P. 56(e).  Consequently the government's reliance on the affidavit from Mr. Howard for the conclusion that the medical records fail to substantiate any of the injuries he claims cannot not be considered in support of the government's motion for summary judgment.

This, though, is not fatal to the government's motion since no affidavit is even necessary. Fed. R. Civ. P. 56(a) permits the claimant to move for summary judgment, "with or without supporting affidavits."  Thus the court can include consideration of the accompanying medical records submitted by the record custodians under the rules of evidence without the additional comments upon these records.

Lyons' reliance on 18 U.S.C. §4042(a) and the BOP program statement indicates that Lyons anticipates opposition under the discretionary function provision of 28 U.S.C. §2680(a).  Lyons is correct.  Several of his arguments under his medical malpractice claim are examples of discretionary functions over which this court lacks jurisdiction.

4:03 CV 0244                                    19

Liability under 28 U.S.C. §1346(b) is governed by state law and this extends to claims of medical malpractice. See *Vance v. U.S.*, 90 F.3d 1145, 1148 (6th Cir. 1996); *Sellers v. U.S.*, 870 F.2d 1098, 1101 (6th Cir. 1989); and see *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 478, 114 S.Ct. 996, 1001, 127 L.Ed.2d 308 (1994)( In a federal tort claims action it is the law of the state where the events occurred that controls.). The government argues that the applicable state standard is from *Bruni v. Tatsumi*, 46 Ohio St.2d 127 (1976), which sets out the medical malpractice standard for physicians in the state of Ohio. This argument ignores the fact that Lyons received medical care also in North Carolina and Kentucky. This is not the only deficiency in the government's motion since several of Lyons' allegations under his second count do not involve medical malpractice.


Lyons' arguments challenge both medical care and policy-driven decisions. When a discretionary function is involved, it is to be resolved under 28 U.S.C. §2680(a) rather than state rules. See *Muniz*, 374 U.S. at 164, 83 S.Ct. at 1859. "[T]he duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. §4042, independent of an inconsistent state rule. (footnote omitted): *Muniz*, U.S. at 164-65, S.Ct. at 1859. As conversely stated, "the United States is not immune from claims which challenge the actual administration of medical care by its employees when the claims do not concern actions which are the product of judgment driven by the consideration of competing policy-based choices." *Fang v. U.S.*, 140 F.3d 1238, 1241-42 (9th Cir. 1998); and see *Sigman v. U.S.*, 217 F.3d 785, 796 (9th Cir. 2000).

As *Sigman* explained, borrowing from the Administrative Law Treatise:

> The discretionary function exception is limited to the exercise of governmental discretion and does not apply to the exercise of nongovernmental discretion such as professional or occupational discretion... The physician at the veterans' hospital exercises professional discretion in deciding whether or not to operate; . . . he combines professional discretion with governmental discretion when he decides that budgetary restrictions require nonuse of an especially expensive treatment in absence of specified conditions.
>
> K. Davis, *Administrative Law Treatise* §25.08 at 403-04 (Supp. 1982), quoted from *Sigman,* 217 F.3d at 796.

As illustrated in *Fang*, the government exercised its discretionary function when it determined the amount and quality of medical equipment it needed to maintain at a national park, but the administering of medical care on the patient had nothing to do with these policy considerations. *Fang*, 140 F.3d at 1242-43.

Lyons complains that he was seen by lower level medical staff and did not see a physician immediately following the February 12, 2000 incident.  The prison's decision to allow a nurse and later a physician's assistant to examine him following the assault, as opposed to requiring a physician to conduct the examination, is an example of government discretion under 18 U.S.C. §4042(a) and the BOP Program Statement 6000.5 which reads:

> Bureau policy is to provide necessary medical care consistent with community standards.  Further, it is Bureau practice to maintain the health of inmates by providing medical care for significant problems that are persistent or longstanding, within available resources.

4:03 CV 0244                                      21

From the language of the program statement, it is obvious that this allows prison authorities discretion since the medical care they provide is "within available resources." There is certainly no mandatory language within the program statement nor in 18 U.S.C. §4042(a) as discussed earlier that requires prison authorities to provide medical care commensurate with Lyons' standards. *Gaubert's* presumption that this was a policy driven decision applies and Lyons' affidavit does not allege facts sufficient to rebut the presumption that the decisions regarding his care and safety were not "of the kind that the discretionary function exception was designed to shield." *Id.*, 499 U.S. at 322-23; *Montez*, 359 F.3d at 397.

The same reasoning holds true to Lyons' request for vocational rehabilitation services. Lyons faults prison authorities for not providing him with vocational rehabilitation since the neuropsychological examination indicates that he may have vocational shortcomings following release in resuming his profession as a chemist. Again, however, Lyons can point to no mandatory provision requiring these services. Lyons, in effect, admits that he was rehabilitated to function as a prisoner. However his affidavit does not challenge sufficient facts to overcome the discretionary vocational rehabilitation for Lyons to resume his former vocation.

Lyons' argument raises the issue of to what extent the BOP must restore an injured prisoner. Obviously, Lyons seeks to be restored to full function, mentally and physically. According to his affidavit, the care he received only healed him to the point of being capable of functioning in the prison environment. Obviously, a cost/benefit policy is guiding the degree of medical care Lyons

4:03 CV 0244                                   22

received, and that certainly cannot be equated with state tort law on malpractice nor can Lyons override discretion granted under §4042(a) to limit resources.

Further, Lyons faults the government for not having the necessary diagnostic equipment apparently in reference to FCI-Elkton.  Again, this is a matter of governmental discretion.  As pointed out in *Fang v. U.S.*, 140 F.3d 1238 (9th Cir. 1998), the government exercised its discretionary function when it decided the amount and quality of medical equipment it needed to maintain to respond to accidents in a national park.  See *Id.* at 1243.

Finally, the matter of alleged interference with medical care is outside the claim of medical malpractice.  Lyons complains of medication substitution (Affidavit ¶68, 79), and delay from March 2001 to June 2004 in obtaining the neuropsychological evaluation that had been recommended (Affidavit ¶65, 87).  However, the policy behind changes in the prison "formulary" has not been shown to be outside those "of the kind that the discretionary function was designed to shield," based on Lyons' affidavit.  See *Montez*, 359 F.3d at 397.  Lyons has no evidence that the medical professional viewed the substituted medications as less effective and he never alleges that he complained to the physicians that the substitutes were not effective. If the efficacy of the medication was in doubt, Lyons should have availed himself of available prison procedure and complained that the drug was not effective. The BOP has authority to grant approval of a non-formulary drug.  See *Borja v. U.S.*, 2006 WL 3042962 (M.D. Pa. 2006).  Further, assuming the delay in referral for neuropsychological examination fell outside reasonable policy objectives, Lyons has shown no injury due to delay in this examination to warrant examination of the underlying policy.

4:03 CV 0244                                     23

Consequently, this court lacks jurisdiction due to the discretionary function exception and *Gaubert's* unrebutted  presumption that these decisions were of the kind the discretionary function was designed to shield.


Lyons' remaining allegations complain about the quality of medical care he received. Generally speaking, the medical malpractice law of Ohio, Kentucky and North Carolina is based on shared doctrine.  "By statute, North Carolina defines 'medical malpractice action' as 'a civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider,' including a doctor, a pharmacist, or a hospital." *Iodice v. U.S.*, 289 F.3d 270, 275 (4th Cir. 2002),  quoting N.C. Gen. Stat. §90-21.11 (1999).  Further as provided under N.C. Gen. Stat. §90-21.12 governing the standard of health care, "the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action."  The requirements for medical malpractice in North Carolina do not differ greatly from those in Ohio. Medical malpractice has four elements: the applicable standard of care; a breach of standard of care by the defendant; proximate injury and damages resulting.  See *Smith v. Whitmer*, 159 N.C. App. 192, 195, 582 S.E.2d 669 (2003); *Weatherford v. Glassman*, 129 N.C. App. 618, 621, 500 S.E.2d 466 (1998).  Further in order to demonstrate medical malpractice, the plaintiff must establish the relevant standard of care through expert testimony.  *Smith*, 159 N.C. App. at 195; *Weatherford*, 129

4:03 CV 0244                                                24

N.C. App. at 621.  North Carolina does recognize the common knowledge exception but that applies only where the physician's conduct is either grossly negligent or treatment is of such a nature that the common knowledge of lay persons is sufficient to find the standard of care required. *Weatherford*, 129 N.C. App. at 623-24.  Gross negligence embodies willful or wanton conduct of the physician that proximately causes injury to the patient.  *Id.*   The patient's sworn statement regarding the injuries that resulted from the physician's alleged failure to diagnose infection following surgery has been held not to be sufficient under the common knowledge exception.  And see  *Bailey v. Jones*, 112 N.C. App. 380, 435 S.E.2d 787 (1993).   Lyons has no expert witness and his allegations concerning the care do not rise to gross negligence under North Carolina law to establish medical malpractice under North Carolina's common knowledge exception.


In regard to the allegations that FMC-Lexington, Kentucky has a similarly based cause of action for medical malpractice requiring the plaintiff to establish a duty on the part of the defendant, a breach of that duty and consequent injury.  See *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky.    1992); *Matthews v. Robinson*, 52 Fed. Appx. 808, 809 (6th Cir. Dec. 12, 2002). As in North Carolina, generally expert testimony is required to show that a medical provider failed to conform to the applicable standard of care and caused the plaintiff's injury.  See *Vance*, 90 F.3d at 1148; *Jarboe v. Harking*, 397 S.W.2d 775, 777-78 (Ky. 1965).  However as recognized in *Vance*, Kentucky also permits "the necessary expert testimony may be supplied by the defendant's admissions during discovery, or through medical evidence obtained from other treating physicians." *Vance*, 90 F.3d at 1148, citing *Perkins v. Hausladen*, 828 S.W.2d 652, 655-56 (Ky. 1992).  Further Kentucky recognizes the common knowledge exception "where the common knowledge or

4:03 CV 0244                              25

experience of laymen is extensive enough to recognize or to infer negligence from the facts."

*Perkins* at 655, quoting *Jarboe v. Harding*, 397 S.W.2d 775, 778 (Ky. 1965).


Lyons has no medical expert nor does he have admissions from the defendant or statements

of other physicians establishing that the medical provider failed to adhere to a standard of care of

a reasonably competent practitioner in the same medical field.  See *Reams v. Stutler*, 642 S.W.2d

586, 588 (Ky. 1982); *Blair v. Eblen*, 461 S.W.2d 370, 373 (Ky. 1970). [5]  Consequently, Lyons fails

to establish medical malpractice under the law of the Commonwealth of Kentucky.


With respect to the allegations concerning FCI- Elkton:

> "[I]n order to maintain a cause of action in medical malpractice, three
> elements must be proved.  Plaintiff must establish the applicable standard of
> care, usually through expert testimony, show a negligent failure on the part
> of the defendant to render treatment in conformity with the standard of care;
> and demonstrate that the resulting injury was proximately caused by
> defendant's negligence." *Ulmer v. Ackerman*, 87 Ohio App.3d 137, 140, 621
> N.E.2d 1315, 1317 (1993); *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 77 O.O.2d
> 184, 346 N.E.2d 673 (1976).


The same general standard for medical malpractice by a physician applies to claims of

medical malpractice brought by prisoners.  *Buerger v. Ohio Dept. of Rehab. & Corr.*,  64 Ohio

App.3d 394, 397-98, 581 N.E.2d 1114 (1989).  Prisoners, as all plaintiffs, must establish more than

---

[5] Lyons, commensurate with his opposition to the government's motion for summary judgment, has moved under Fed. R. Civ. P. 56(f) to conduct additional discovery relying on *Vance v. U.S., supra*.  Lyons argues that he has not been dilatory in discovery and he needs additional discovery on BOP rules and regulations regarding staffing, medical procedures regarding classifications of head injuries and the reports and standards of the joint commission on accreditation of health care organizations.  (See Lyons' Affidavit, ¶¶96-100, ECF #83-2).  He does not propose what other treating physician he would seek out to establish relevant evidence of malpractice.

4:03 CV 0244                                        26

mere negligence to sustain an action against medical personnel or the institution. See *Sloan v. Ohio Dept. of Rehab. & Corr.*, 119 Ohio App.3d 331, 334, 695 N.E.2d 298 (1997); *Promen v. Ward*, 70 Ohio App.3d 560, 565, 591 N.E.2d 813 (1990).

"Failure to establish the recognized standards of the medical community has been fatal to the presentation of a *prima facie* case of malpractice by the plaintiff[ ]." *Bruni* at 131; *Buerger*, at 398. Plaintiff's failure to produce expert evidence on the standard of care or medical records showing lack of care generally results in dismissal. *Buerger* at 398; and see *Sommer*, 317 F.3d at 694-95. The degree of care required must generally be proven by expert testimony. *Bruni*, at 131-32. Further, an essential element of a medical malpractice claim is proof that the injury was proximately caused by the failure of the physician to adhere to the standard of care. *Id.*

Expert testimony is not necessary under Ohio's "common knowledge exception" to the general rule requiring expert opinion. *Buerger*, at 400-01. This exception applies when the breach of duty is readily apparent from plaintiff's evidence that a layman would understand it from common knowledge and experience. *Id.* This exception has limited scope in matters involving diagnosis and treatment. *Id.* at 400; *Whiteleather v. Yosowitz*, 10 Ohio App.3d 272, 275, 461 N.E.2d. 1331 (1983). However, the common knowledge may apply in matters of gross inattention to obvious situations. *Buerger*, 64 Ohio App.3d at 399; *Jones v. Hawkes Hosp. of Mt. Carmel*, 175 Ohio St. 503, 196 N.E.2d 592, 26 Ohio Op.2d 170 (1964) (unattended unrestrained delirious pregnant woman who had attempted to climb from her bed several times); *Wharton v. Long*, 18 Ohio L.Abs. 147 (App. 1934) (failure to attend to child who was vomiting blood and had high fever after surgery). Complaints

4:03 CV 0244                                             27

of persistent pain subsequent to medical care, however, do not fit within the common knowledge exception and are insufficient to establish an inference of medical malpractice.  *Buerger*, 64 Ohio App.3d at 400.


Lyons presents no affidavit or deposition from a physician to raise the possibility of medical malpractice.  Further, although lacking  immediate x-ray, CT scan or MRI test conducted following the February 12, 2000 assault, the initial examination and a subsequent CT scan also as evidenced by Lyons' own affidavit were normal.  Lyons has not put forth sufficient facts to state his case under the common knowledge exception or through admission from the medical service provider.  Accordingly, the court lacks subject jurisdiction over a portion of the allegations in the second count and Lyons has not presented genuine issues of material fact to controvert defendant's  motion for summary judgment regarding allegations of medical malpractice.


*Obstruction of Justice:*

In a third set of issues, Lyons complains that the investigation into the February 12, 2000 assault was seriously flawed and Lyons was never able to file any charges or afforded the opportunity to confront his attackers in a court of law due to the deliberate efforts of prison personnel.  Lyons finds a mandatory duty under the obstruction of justice statutes contained in 18 U.S.C. §§1503, 1505, 1510, 1513 and 1515 regarding but not limited to investigations and proceedings conducted by the Department of Justice, Congress and Senate.  (See Amended Complaint, ¶¶67, 80-82).  Further within this third count he interjects his medical argument as "manipulation" of his security status through an unfounded psychological factor, apparently in

4:03 CV 0244                                              28

reference to the unfavorable psychological classification and also refers to scheduling of inadequate

diagnostic tests.  (Amended Complaint,  ¶82).

The government counters that this claim lacks merit because prison authorities quickly

investigated his assault and placed Lyons in isolation until the investigation could be completed

(Amended Complaint, ¶¶18, 21-22).  Lyons contends that failure to investigate and prosecute the

crime against him was done in order not to have the prison expose the systemic deficiencies in

staffing security facilities and "other procedures" which made the assault inevitable (Amended

Complaint, ¶81).

To repeat, the matter of security classification as explained previously is a

discretionary function. Also there is no subject matter jurisdiction over the remaining claims because

inaction by decision not to investigate, discipline or respond in form to the assault are matters which

fit within the discretionary function exception to the FTCA. See *Calderon*, 123 F.3d at 949-51;

*Alfrey v. U.S.*, 276 F.3d 557, 564-66 (9th Cir. 2002)(no jurisdiction no matter whether there is a

failure to investigate or negligent investigation); *Montez*, 359 F.3d at 396.  Accordingly, there is no

subject matter over the third count of the amended complaint.

4:03 CV 0244                                    29

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons plaintiff has not presented genuine issues of material fact to establish his claims or jurisdiction over his claims, and defendant's motion for summary judgment should be granted with judgment entered for the defendant.

                                    _____s/James S. Gallas_____
                                    United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).


Dated: September 12, 2007